# Exhibit A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KASSANDRA MEMMER,

                                *Plaintiff-Appellant*,

       *v.*

                                 No. 24-1144

UNITED WHOLESALE MORTGAGE, LLC,

                                  *Defendant-Appellee*.

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-10921—Linda V. Parker, District Judge.

Decided and Filed:  April 18, 2025

Before:  MOORE, CLAY, and THAPAR, Circuit Judges.

———————————

### COUNSEL

———————————

**ON BRIEF:**  Carla D. Aikens, Rejanae M. Thurman, CARLA D. AIKENS, P.L.C., Detroit, Michigan, for Appellant.  James W. Rose, TAFT STETTINIUS & HOLLISTER LLP, Southfield, Michigan, for Appellee.

       MOORE, J., delivered the opinion of the court in which CLAY, J., concurred.  THAPAR, J. (pp. 17–25), delivered a separate dissenting opinion.

———————————

### OPINION

———————————

       KAREN NELSON MOORE, Circuit Judge.  Kassandra Memmer sued her former employer, United Wholesale Mortgage ("UWM"), for discrimination that she allegedly faced during her tenure there.  The lawsuit includes allegations of sexual harassment.  UWM moved to dismiss the lawsuit and compel arbitration under the parties' employment agreement.

The district court granted the motion. Memmer appeals, arguing that the arbitration agreement is invalid and that she has a right to go to court notwithstanding any otherwise valid agreement due to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"). UWM responds that EFAA does not apply here, because Memmer's claims accrued before the law was enacted. As a matter of first impression in our circuit, we conclude that EFAA applies to claims that accrue after its date of enactment and to disputes, understood as controversies between the parties, that arise after that date. We accordingly REVERSE and REMAND for the district court to apply the correct interpretation of EFAA to this case.

## I. BACKGROUND

Memmer was employed as a mortgage underwriter at UWM from September 30, 2019, through July 9, 2021. R. 1 (Compl. ¶¶ 6, 45) (Page ID #2, 6). Memmer alleges that during her time at UWM, she faced numerous instances of discrimination, including UWM's refusal to allow remote work while she was pregnant during the COVID-19 pandemic, *id.* ¶¶ 37–45 (Page ID #5–6), and sexual harassment by a coworker, *id.* ¶¶ 35–36 (Page ID #5). She asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Fair Labor Standards Act ("FLSA"), Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA").

After Memmer filed this lawsuit, UWM moved to dismiss and compel arbitration. R. 7 (Def.'s Mot. to Dismiss & Compel Arbitration) (Page ID #40). The district court granted the motion, concluding that the parties had entered a valid contract to arbitrate Memmer's claims. *Memmer v. UWM*, No. 23-cv-10921, 2024 WL 187697, at *5 (E.D. Mich. Jan. 16, 2024). The district court also rejected Memmer's arguments that her statutory claims were non-arbitrable, although the court did not address Memmer's contention that EFAA applied. *Id.*

The district court dismissed Memmer's complaint without prejudice "because her claims must be arbitrated in accordance with her Employment Agreement." R. 14 (J.) (Page ID #178). Memmer timely appealed. R. 15 (Notice of Appeal) (Page ID #179). We have jurisdiction to review the district court's final decision concerning arbitration. 9 U.S.C. § 16(a)(3); *Great Earth Cos. v. Simons*, 288 F.3d 878, 885 (6th Cir. 2002).

## II.  ANALYSIS

The Federal Arbitration Act ("FAA") allows a party to an arbitration agreement to petition a federal court for enforcement.  9 U.S.C. § 4.  Before granting a motion to compel arbitration, the district court must assure itself that (1) the parties agreed to arbitrate; (2) the claims asserted fall within the scope of the arbitration agreement; and (3) Congress did not intend for those claims to be non-arbitrable.  *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003).  We review the district court's conclusions de novo.  *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 797 (6th Cir. 2023).

### A.  Agreement to Arbitrate

We start with the parties' agreement.  Whether the parties entered a valid agreement to arbitrate is a question of state contract law.  *Fazio*, 340 F.3d at 393; *see* 9 U.S.C. § 2.  Here, Michigan law applies.  R. 7-1 (Employment Agreement ¶ 30) (Page ID #81).  In deciding whether the parties agreed to arbitrate, the district court looked at documents beyond the complaint, including the employment agreement and affidavits from both parties.  *Memmer*, 2024 WL 187697, at *2.  So, the district court appropriately applied the framework of Rule 56.  *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 838 (6th Cir. 2021).  Under this framework, UWM bears the initial burden to produce evidence sufficient to allow a trier of fact to conclude that the parties entered a contract to arbitrate.  *Id.* at 839.  If UWM does that, the burden shifts to Memmer to place the validity of the agreement at issue.  *Id.*  The only element in dispute here is mutuality of contract—whether there was "a valid offer and acceptance" of the employment agreement.  *McMillon v. City of Kalamazoo*, 983 N.W.2d 79, 81 (Mich. 2023).

UWM met its initial burden here.  The company submitted an employment agreement, apparently e-signed by Memmer, containing a description of an arbitration process followed by this all-caps language:

> BY SIGNING THIS AGREEMENT, EMPLOYEE ACKNOWLEDGES THAT HE OR SHE IS GIVING UP THE RIGHT TO A TRIAL IN A COURT OF LAW AS TO ANY DISCRIMINATION OR OTHER STATUTORY CLAIMS, AND IS HEREBY AGREEING TO SUBMIT ALL SUCH CLAIMS TO BINDING ARBITRATION.

R. 7-1 (Employment Agreement ¶ 32) (Page ID #82). The agreement also contained this bolded language right before Memmer's e-signature.

> **As evidenced by Employee's signature below, Employee hereby acknowledges that he or she has read and understood all of the terms and conditions of this Agreement, that Employee agrees to the terms and conditions of this Agreement, and that this Agreement is binding upon Employee in accordance with its terms.**

R. 7-1 (Employment Agreement) (Page ID #84). UWM also submitted a declaration from Lisa Enriquez, an employee of UWM responsible for "supervision of the hiring and onboarding process for new employees of UWM." R. 7-1 (Lisa Enriquez Decl. ¶ 1) (Page ID #66). Enriquez states that Memmer signed the agreement through UWM's online system by which "candidates (including . . . Memmer) create their own profile, including their own unique log-in and password." *Id.* ¶ 3 (Page ID #67). This evidence satisfied UWM's initial burden of demonstrating that Memmer accepted its offer to arbitrate. *See Boykin*, 3 F.4th at 839; *Bazemore*, 74 F.4th at 798; *Tucker v. UWM, Inc.*, No. 24-1595, 2025 WL 1082316, at *2 (6th Cir. Apr. 10, 2025).

Therefore, the burden shifts to Memmer. To create a "genuine" dispute, Memmer must point to "specific facts, as opposed to general allegations" demonstrating that she did not accept the contract. *Boykin*, 3 F.4th at 839 (citation omitted). Memmer must offer evidence that she did not sign the agreement or otherwise accept its terms. *See id.* "[C]onvenient memory lapses do not create factual disputes that are genuine," but "an unequivocal denial that takes the form of admissible evidence can create a genuine dispute of fact." *Id.* at 839–40 (citation omitted). We have previously held that affidavits from employees attesting that they never signed or never saw the arbitration agreement sufficed to place the issue in dispute. *See Bazemore*, 74 F.4th at 798; *see also Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 415, 418–19 (6th Cir. 2011).

Memmer has not met her burden. In opposition to UWM's motion, she submitted a declaration detailing her recollection of the agreement. But nothing in that declaration creates a genuine dispute about whether she signed. The declaration states that she "do[es] not recall signing," R. 9-2 (Memmer Decl. ¶ 42), but as we have noted, "[c]onvenient memory lapses do

not create factual disputes that are genuine," *Boykin*, 3 F.4th at 839. The declaration further contains statements suggesting that she did not understand the agreement and that she was under time pressure to sign. She claims that she "was never told what [she] was signing," "would not have signed an arbitration agreement without further explanation," and "was told to return [the agreement] as soon as possible." R. 9-2 (Memmer Decl. ¶¶ 43–45). However, these statements do not amount to a denial that she saw and signed the agreement. *See Tucker*, 2025 WL 1082316, at *2–3; *see also Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1002 (6th Cir. 2009). Michigan courts presume that people who sign contracts have read and understood them, and "one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 195 N.W.2d 865, 868 (Mich. 1972). Finally, Memmer has not asserted, much less proved, any defense, such as unconscionability, fraud, or duress that might excuse her signature. *See id.*; *see also* 9 U.S.C. § 2; *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 377 (6th Cir. 2005). Hence, the district court correctly concluded that Memmer and UWM agreed to arbitrate.

**B.  Scope of the Arbitration Agreement**

The next step is to consider whether the claims asserted fall within the scope of the arbitration agreement. They do. The agreement covers "any discrimination or other statutory claims" arising out of her employment. R. 7-1 (Employment Agreement ¶ 32) (Page ID #82). That includes Memmer's claims under Title VII, FLSA, ADA, ELCRA, and PWDCRA.

**C.  Arbitrability of Memmer's Claims**

At this step, we would historically have concluded that Memmer's claims were arbitrable. "The FAA expresses a strong public policy favoring arbitration of a wide class of disputes." *Walker*, 400 F.3d at 376 (quoting *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004)). We and the Michigan courts have previously recognized that similar statutory claims can be sent to arbitration. *Id.* at 377 (FLSA); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 309 (6th Cir. 1991) (Title VII); *Rembert v. Ryan's Fam. Steak Houses, Inc.*, 596 N.W.2d 208, 210 (Mich.

Ct. App. 1999) (ELCRA and PWDCRA); *see* 42 U.S.C. § 12212 ("encourag[ing]" arbitration of ADA claims).[1,2]

But Congress recently enacted a new law that affects our analysis. This law, EFAA, allows an individual claiming sexual harassment or assault to elect judicial resolution, rather than arbitral resolution of their claims, even if the individual previously agreed to arbitrate such claims if they arose.[3] EFAA amends the FAA as follows:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a). On appeal, the parties do not dispute the applicability of EFAA to Memmer's case, which includes allegations of sexual harassment. The sole issue before us is whether the events occurred at the right time. Memmer quit UWM before EFAA was enacted and all alleged sexual harassment occurred before that date. But she filed her administrative claim with the EEOC, as well as this lawsuit, after EFAA became law. We must decide whether EFAA applies here.

---

[1]In her reply brief, Memmer argues that her Michigan state-law claims may not be arbitrable under a forthcoming state court decision. Reply Br. at 9. Memmer forfeited the issue by raising it only in her reply brief. *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018). In any event, any such rule would likely be preempted by the FAA. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011); *see Tucker*, 2025 WL 1082316, at *3.

[2]We do not reach Memmer's forfeited argument that application of the arbitration agreement is contrary to public policy due to other lawsuits pending against UWM.

[3]We reject UWM's argument that Memmer forfeited reliance on EFAA by failing to raise it below. For one, Memmer raised the statute in her opposition to UWM's motion to compel, and UWM responded to the argument in its reply brief, indicating that UWM was on notice of the argument. *See* R. 9 (Pl.'s Resp. to Def.'s Mot. to Dismiss & Compel Arbitration at 12); R. 10 (Def.'s Reply in Supp. of Mot. to Dismiss & Compel Arbitration at 7) (Page ID #133). For another, EFAA is directly codified as a limitation upon the court's power to compel arbitration under the FAA, 9 U.S.C. § 2, and we are doubtful that a party opposing arbitration can forfeit proper application of the statute. *Cf. United States v. Cabbage*, 91 F.4th 1228, 1231 (6th Cir. 2024) ("[C]ourts have an independent obligation to get the law right.").

In a statutory note, Congress provided that EFAA "shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act," which was March 3, 2022.  9 U.S.C. § 401 note ("application note").  To interpret this statutory language, we start with the text.  It is a "cardinal principle of statutory construction that it is our duty to give effect, if possible, to every clause and word of a statute."  *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (cleaned up).  Here, the statute refers to "any dispute *or* claim that arises *or* accrues."  9 U.S.C. § 401 note (emphasis added).  Because Congress used the disjunctive "or," we infer that Congress meant to differentiate, and we must see if separate meaning can fairly be given to each word.

Turning to the words themselves, we see that Congress used two nouns—"dispute" and "claim"—together with two verbs—"arises" and "accrues."  The remaining parts of the statute, together with our background legal understandings, help us understand how they interact.  In legal parlance, the term "claim" is commonly associated with the concept of "accrual."  *See Accrue*, Black's Law Dictionary (11th ed. 2019) ("To come into existence as an enforceable claim or right, to arise.").  The word "dispute," on the other hand, does not correspond with the word "accrue."  We have not heard of "disputes that accrue."  But we are familiar with "disputes that arise."  And so is the statute.  On two occasions, the statute refers to "*dispute[s]* that had not yet *arisen* at the time of the making of the agreement."  9 U.S.C. § 401(1)–(2) (emphasis added).  These reference points—in our legal understanding and the statutory text—clarify the grammatical structure of the sentence, demonstrating that the EFAA applies to *claims that accrue* and *disputes that arise* on or after March 3, 2022.  In our endeavor to give effect to each of these clauses, we ask whether each bears separate meaning.  We conclude that they do.

The word "claim" carries multiple related meanings in the law—but only one in the context of the application note.  The word can refer to (1) "[a] statement that something yet to be proved is true," like "claims of torture"; (2) "[t]he assertion of an existing right . . . even if contingent or provisional," like a "spouse's claim to half of the lottery winnings"; (3) "[a] demand for money, property, or a legal remedy to which one asserts a right," i.e., a "*claim for relief*"; and (4) "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing," i.e., "a cause of

action" like a "claim against the employer for wrongful termination."  *Claim*, Black's Law Dictionary (11th ed. 2019).  In the context of accrual, "claim" bears only the last meaning:  cause of action.  *Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 (2024).  A claim accrues "when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief.'"  *Id.* at 809 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)).

Claim accrual is significant in the litigation and arbitration contexts.  In litigation, the statute of limitations usually runs from the date on which the claim accrued.  *Id.* at 811.  If a plaintiff waits too long to file suit, she is barred from pursuing her claim in court.  Although statutes of limitations do not directly apply to arbitration, 31 Williston on Contracts § 79:115 (4th ed. 2024), parties use accrual dates and statutes of limitations to set boundaries on the time to file for arbitration.  Here, for example, the employment contract between Memmer and UWM requires that an employee "request arbitration . . . within six (6) months of the date of termination or *accrual of the claim*, or within a shorter period of time if one is prescribed by the statute upon which [the] [e]mployee's claim is based."  R. 7-1 (Employment Agreement ¶ 32) (Page ID #82).  Should the employee fail to request arbitration in that time, the "[e]mployee's claim [is] waived."  *Id.*

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."  *Morissette v. United States*, 342 U.S. 246, 263 (1952).  Accordingly, when we talk about claims in the context of accrual, we can infer that Congress means something specific:  a cause of action that becomes complete and ready to vindicate once certain elements are in place.  *Secs. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 125 (2024) ("[W]hen Congress transplants a common-law term, the old soil comes with it." (quoting *United States v. Hansen*, 599 U.S. 762, 778 (2023)).  Hence, under the statute, if a claim, i.e., cause of action, accrues after March 3, 2022, EFAA applies.

The word "dispute," on the other hand, usually denotes a controversy between parties. A dispute is a "conflict or controversy, esp[ecially] one that has given rise to a particular lawsuit." *Dispute*, Black's Law Dictionary (11th ed. 2019); *Dispute*, Ballentine's Law Dictionary (3d ed. 2010) ("controversy. An allegation of fact by one person denied by another, each acting with some show of reason."). This is how the statute uses the term "dispute." The statute defines a "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4). And it defines a "predispute arbitration agreement" as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." *Id.* § 401(1). These uses of "dispute" denote a controversy between the parties regarding certain kinds of conduct, conduct which may support claims under state and federal law. A predispute arbitration agreement, then, is an agreement to resolve a controversy, which may or may not relate to claims that can be asserted in arbitration or in court. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings.").

Unlike claim accrual, we lack a set legal framework to determine when a dispute arises. Depending on the facts, a dispute could arise when an injured party sends the defendant a demand letter, files an administrative charge, requests arbitration, commences a lawsuit, or some other event occurs. *See Famuyide v. Chipotle Mexican Grill, Inc.*, 111 F.4th 895, 897–98 (8th Cir. 2024). The relevant question is when the parties became adverse to one another. *Id.*; *see Cornelius v. CVS Pharmacy Inc.*, No. 23-2961, -- F.4th --, 2025 WL 980309, at *5 (3d Cir. April 2, 2025). In many cases, the dispute will arise after the claim accrues. For example, a sexual-harassment claim may accrue when one employee makes an inappropriate remark to another, but the dispute may not arise until the employer resists the employee's complaints. But the converse could also be true. A dispute may arise between the parties about the harassment, but if the harassment continues, a continuing violation, such as a hostile work environment claim, might subsequently accrue due to the later events. *See Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74, 85–87 (2d Cir. 2024). Ultimately, when a dispute arises is a fact-dependent inquiry that can be determined in the context of each case.

Our interpretation of the statute accords with the approach adopted by Third and Eighth Circuits. *Famuyide*, the Eighth Circuit case, concerned a suit like this one wherein the relevant claims accrued before the effective date of the statute. *See* 111 *Famuyide*, F.4th at 897. Relying on the definition of "dispute" from *Black's Law Dictionary*, the panel concluded that the dispute arose once there was a controversy between the parties. *Id.* at 898. The panel rejected Chipotle's argument that the dispute arose when the relevant harassing conduct occurred—likely when the claim accrued—because, at that point, "Famuyide had not asserted any right, claim, or demand against Chipotle, and Chipotle had not registered disagreement with any position of Famuyide's." *Id.* The court also rejected Chipotle's argument that the dispute arose when Famuyide's counsel sent a letter to Chipotle explaining that he was investigating claims of sexual harassment because "[t]his sort of exploratory letter from counsel does not establish a dispute or inevitably lead to one." *Id.* Having disposed of Chipotle's arguments, the Eighth Circuit affirmed the district court's denial of the motion to compel arbitration. *Id.* at 899. The Third Circuit recently followed the Eighth Circuit's approach. In *Cornelius*, the Third Circuit panel held that the "ordinary meanings of both 'dispute' and 'arise'" compelled the conclusion that EFAA applies "when an employee registers disagreement—through either an internal complaint, external complaint, or otherwise—with his or her employer, and the employer expressly or constructively opposes that position." *Cornelius*, 2025 WL 980309, at *5. We agree.

Our approach is also consistent with the Second Circuit's recent opinion on claim accrual as it pertains to EFAA. In *Olivieri*, the Second Circuit did not reach the question of when a dispute arose because the case concerned a hostile-work-environment claim, which re-accrued after the litigation began. 112 F.4th at 85–87. The panel noted, however, that its decision was consistent with the Eighth Circuit because both decisions "support[ed] [the] conclusion that events occurring before the EFAA's effective date can be relevant to application of the EFAA." *Id.* at 90 n.8.[4]

---

[4]The only other federal appellate court to address this issue is the Fourth Circuit, which declined to apply EFAA to claims that accrued before the law was enacted. *Bopda v. Comcast of the Dist., LLC*, No. 23-2148, 2024 WL 399081, at *1 (4th Cir. Feb. 2, 2024). The *Bopda* decision is not persuasive because it addressed the application note in a one-paragraph, nonbinding, unpublished order that did not grapple with the statutory language.

Opposing the application of EFAA here, UWM cites several state and district court opinions declining to apply EFAA to claims that accrued before EFAA was enacted.  Many of those cases involved lawsuits filed before EFAA was enacted.  *See, e.g.*, *Murrey v. Superior Court*, 304 Cal. Rptr. 3d 439, 447 (Cal. Ct. App 2023).  Our decision is not inconsistent with these cases because they involve disputes (here, lawsuits) that arose before EFAA was enacted.  Other courts have understood "dispute" as referring to the allegedly harassing or assaultive conduct itself and looked to when the conduct occurred, which frequently coincides with the moment when the claim accrued.  *See, e.g.*, *Jackson Memmer v. UWM*, No. 23-cv-11261, 2023 WL 8818298, at *6 (E.D. Mich. Dec. 18, 2023); *Barnes v. Festival Fun Parks, LLC*, No. 3:22-cv-165, 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023).  We do not find those opinions persuasive, because they deprive the word "dispute" of its ordinary meaning.  *See Cornelius*, 2025 WL 980309, at *4.  And they conflict with the use of the word "dispute" elsewhere in the statute.  *See* 9 U.S.C. § 401(4) (defining a "sexual harassment dispute" as "a *dispute relating to conduct* that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law" (emphasis added)).  Finally, UWM cites a case that attributes the statute's use of the word "dispute" to an effort to "encompass various kinds of proceedings."  *Walters v. Starbucks Corp.*, 623 F. Supp. 3d 333, 338 (S.D.N.Y. 2022).  The dissenting opinion makes a version of this argument, which we grapple with more fully below.

Before finally reaching our disagreement with the dissenting opinion, we pause briefly to note why we also reject plaintiff's proposed interpretation of EFAA, which would run the "dispute" clock only from the date when the lawsuit is filed.  This interpretation of the word "dispute" is too narrow and fails to capture the broader, ordinary meaning of the word "dispute."  *See Cornelius*, 2025 WL 980309, at *5.  Further, the statute refers elsewhere to "a case which is filed," 9 U.S.C. § 402(a), suggesting that, if Congress meant to so limit the meaning of the word "dispute," it would have done so.  *See Pulsifer*, 601 U.S. at 149.  Depending on the facts of the case, a dispute may arise on the date that a lawsuit was filed, but it may arise earlier, too.

Parting ways with our sibling circuits, the dissenting opinion takes the position that "dispute" means "claim" in the application note, and Congress used the term "dispute" only to "speak[] the language of both arbitration and civil litigation."  Dissenting Op. at 19.  According

to the dissenting opinion, the statute applies only when a claim accrues after the enactment date. Respectfully, we disagree.

To begin, the dissenting opinion errs by overstating the nexus between disputes and arbitration, and claims and litigation. Legal dictionaries recognize that litigation and arbitration are both methods of dispute resolution. As *Black's Law Dictionary* explains, a *court* "consist[s] of one or more judges who sit to adjudicate *disputes*." *Court*, Black's Law Dictionary (11th ed. 2019) (emphasis added). A *civil proceeding* is "[a] judicial hearing, session, or lawsuit in which the purpose is to decide or delineate private rights and remedies, as in a *dispute* between litigants in a matter relating to torts, contracts, property, or family law." *Civil Proceeding*, Black's Law Dictionary (11th ed. 2019) (emphasis added). *Arbitration*, similarly, is a "*dispute*-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the *dispute*." *Arbitration*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Arbitration offers an *alternative* "procedure for settling a *dispute* by means other than litigation." *Alternative Dispute Resolution*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

The U.S. Code recognizes the same. The Code refers to disputes in both judicial and arbitral contexts. *See, e.g.*, 28 U.S.C. § 4001(g); 36 U.S.C. § 220509(a); 49 U.S.C. §§ 11708(b)(1), 14708. And the Code recognizes that both judicial and arbitral disputes may involve claims, which could be asserted in either forum. *See, e.g.*, 28 U.S.C. §§ 1367, 2679; 42 U.S.C. § 9622(h); 49 U.S.C. § 44308(b). Likewise, the parties' own arbitration agreement refers to the "submi[ssion]" of both "dispute[s]" and "claims to binding arbitration." R. 7-1 (Employment Agreement ¶ 32) (Page ID #82). Disputes and claims are relevant to both litigation and arbitration.

The dissenting opinion improperly conflates the term "dispute" with the term "claim" as it is used in the context of this statute. As we have explained, the terms "dispute" and "claim" both may suggest legal controversies in some contexts. But it does not follow that "dispute" and "claim" always share the same meaning. Here, Congress chose to use a specialized meaning of the word "claim" by coupling it with the word "accrue," telling the reader that it was referring to a cause of action. But Congress used the word "dispute" in a more general way. The dissenting

opinion's logical leap elides the ordinary meaning of "dispute" with the specific meaning of "claim" and narrows the application of EFAA beyond what we can find in the statutory language. Had Congress wanted to limit EFAA's application to claims that accrue after the date of enactment, it could have used the language of claim accrual alone. Considering the ubiquity of claims in both litigation and arbitration, Congress had no need to use the word dispute only to make the statute understandable to the world of arbitration, as the dissenting opinion suggests. *See* Dissenting Op. at 20 n.1. We recognize, as the dissenting opinion points out, that there is no ready formula for calculating when a dispute arises, like there is for calculating when a claim accrues. But this administrability concern is not a valid reason for overriding the statutory text here. *See Cornelius*, 2025 WL 980309, at *5 n.9.

Further, the dissenting opinion's use of legislative history is not persuasive. The legislative history relied upon by the dissenting opinion—a House Report and floor debates— does not speak directly to the application note at all. To the extent it is relevant, the House Report's discussion of § 402 "provid[ing] that at the election of a person alleging conduct that constitutes a sexual harassment or sexual assault *claim*, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable relating to *disputes* described within the chapter," H. Rep. No. 117–234, at 19 (emphasis added), supports the conclusion that we reach—that the conduct may constitute a claim, and that disputes are controversies that may pertain to enforceable claims.

The floor debates offer no more insight into the specific issue we face. In these debates, legislators used the words "claim" and "dispute," sometimes in ways that suggest interchangeability, but often not. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("[T]here are many other faces in the crowd."). For example, Rep. Jayapal seemed to equate claims and disputes when she criticized "forced arbitration agreements" for "requir[ing] that people with *disputes against a company* use a secretive, one-sided mediation process instead of the judicial system." 168 Cong. Rec. H987 (daily ed. Feb. 7, 2022) (emphasis added). But minutes later, Rep. Jordan, a critic of the Act, used the word "dispute" to refer to a controversy outside the arbitration conference room, stating that "if parties can't agree in advance to arbitrate, then they are unlikely *to agree to arbitrate after there has been a dispute*."

*Id.* at H990 (emphasis added).  Shortly thereafter, Rep. Nadler, the bill's sponsor, distinguished between claims and disputes, stating that the Act would "giv[e] [survivors] a real choice of whether to go to court or to *arbitrate their claim after the dispute has arisen*."  *Id.* at H991 (emphasis added).  As these examples show, the words "dispute" and "claim" were used in different ways at different time in the floor debates—whereas Rep. Jayapal used the word "dispute" to suggest the legal equivalent of a claim, Reps. Jordan's and Nadler's statements suggest that a dispute is a disagreement distinct from the arbitration proceeding.  The floor debates are of little interpretive value here, and we should be wary to engage in "legislative-history tea-reading," *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 901 (6th Cir. 2020) (Thapar, J., concurring), about the significance of how legislators used these particular words.

None of the dissenting opinion's objections to our interpretation moves the needle.  First, the dissenting opinion claims that our interpretation of the statute fails to appreciate the statutory context.  *See* Dissenting Op. at 21.  The opposite is true.  Whereas we have taken account of the way the statute uses the words "dispute" and "claim," the dissenting opinion relies on the mere use of the word "dispute" elsewhere in the statute without considering how that word is deployed.  Second, the dissenting opinion asserts that the ordinary meaning of "dispute" favors its position, because the definition suggests that a dispute precedes the lawsuit.  Dissenting Op. at 21 (citing *Dispute*, Black's Law Dictionary (12th ed. 2024)).  In so doing, the dissenting opinion concedes that the ordinary meaning of a dispute refers to the times when "something happens, and it generates conflict or disagreement."  *Id.*  And we have never suggested that the dispute always arises at the time the lawsuit is filed.  Indeed, in most cases, the parties recognize their own disagreement before filing suit.  Third, the dissenting opinion accuses us of creating superfluity because, as we interpret the word "dispute," the dispute will often arise after the claim has accrued.  *See* Dissenting Op. at 24.  On this score, the dissenting opinion fares poorly, since, under its interpretation, a dispute can *never* arise at any time except when the claim accrues.  Moreover, Congress enacted the law with an unmistakable purpose of enabling survivors of sexual harassment and assault to pursue their claims in court rather than arbitration, even though the parties had previously agreed to do otherwise.  *See* H. Rep. 117-234 at 3–4.  We think it is more likely that Congress intended to provide these individuals with more expansive access to the courts that the dissenting opinion would provide.

Ultimately, the dissenting opinion offers an intriguing tale of how Congress resolved "something of a pickle," Dissenting Op. at 20, but we need not write a story when the statute gives us the answer. Congress had no need to "bridge[] two legal worlds," *id.* at 18, because disputes and claims are relevant to both worlds and carry separate meanings in the context of the statute. To summarize, when a dispute arises, or when the relevant claim accrues on or after March 3, 2022, a plaintiff may elect to proceed in court notwithstanding a preexisting agreement to arbitrate.

The question then is whether (1) Memmer's sexual-harassment claim accrued on or after the date of enactment or (2) the parties' dispute arose on or after the date of enactment. Memmer quit her job at UWM on July 9, 2021. R. 1 (Compl. ¶ 45) (Page ID #6). She filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 26, 2022. R. 9-1 (Charge of Discrimination) (Page ID #108). The EEOC issued a right-to-sue letter on January 19, 2023. R. 9-3 (Notice of Right to Sue) (Page ID #116). She filed the present lawsuit on April 19, 2023. *See* R. 1 (Compl.) (Page ID #1). As the record stands, it appears that Memmer's claim accrued before the date of enactment, March 3, 2022, because she quit her job several months prior, and any injury, therefore, preceded that date. However, all subsequent events, including the filing of a charge with the EEOC, took place *after* the date of enactment.

When the dispute—the controversy between the parties—arose under the facts of this case is a question best answered in the first instance by the district court. Accordingly, we will remand for the district court to decide and, if needed, obtain a factual record on which to do so. We recognize that the district court did not address EFAA in its initial opinion and, on remand, other questions may become relevant. For example, must plaintiff's sexual harassment claim be "plausible" to remain in court? *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 583–88 (S.D.N.Y. 2023). Does Memmer's single sexual harassment claim suffice to preserve her entire case in court, or should the other claims be sent to arbitration? *See Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558–61 (S.D.N.Y. 2023). These and other novel questions about the application of EFAA have not been meaningfully raised before us, and we leave it to the district court to consider in the first instance such issues as they arise.

## III.  CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

————————————

**DISSENT**

————————————

THAPAR, Circuit Judge, dissenting.  Courts normally don't read statutory text divorced from its context.  But that's what the majority does today.  When read in context, the text of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act doesn't cover Kassandra Memmer's suit.  Therefore, I respectfully dissent.

I.

Memmer worked as an underwriter for United Wholesale Mortgage (UWM).  After quitting her job, Memmer sued UWM in federal court, bringing various claims under state and federal law for retaliation, hostile workplace environment, failure to accommodate, discrimination, harassment, and overtime and minimum wage law violations.  Some of her claims included allegations of workplace sexual harassment.

Memmer's suit has a problem.  Before she started working for UWM, Memmer signed an employment agreement with UWM.  And that agreement expressly provided that all disputes arising out of her employment that touch on discrimination or other statutory violations had to be submitted to arbitration.

The majority correctly concludes that the employment contract that Memmer signed with UWM is a valid and enforceable arbitration agreement under the Federal Arbitration Act (FAA).  Further, Memmer's claims fall within the scope of the FAA.

Normally, those conclusions would end this case and call for affirming the district court's decision to dismiss Memmer's suit and compel arbitration.  But there's a complication.  Congress passed a law in 2022 invalidating arbitration agreements as applied to sexual assault and sexual harassment disputes.  The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act provides that controversies about sexual assault and sexual harassment that previously would have been arbitrable disputes destined for a conference room are now claims destined for a courtroom.  But the Act covers only disputes that arise on or after March 3, 2022,

and Memmer's time with UWM came to an end back in July 2021—well before March 2022. So I disagree with the majority that there's any chance that Memmer's suit falls within the scope of the Act.

II.

As always, start with the text. The Act provides that no arbitration agreements are valid "with respect to a case" that "relates to" sexual assault or harassment disputes. Pub. L. No. 117-90, § 2(a), 136 Stat. 26, 27 (2022). But the Act applies only to a "dispute or claim that arises or accrues on or after [its] date of enactment"—March 3, 2022. *Id.* § 3, 136 Stat. at 28.

Courts interpreting the Act's effective date provision often presume that its operative language—disputes or claims that arise or accrue after March 3, 2022—pairs the noun "dispute" with the verb "arises" and the noun "claim" with the verb "accrues." So, they assume, the date upon which a *dispute* arises is different from the date upon which a *claim* accrues.

That's a fair assumption. The words "dispute" and "claim" are different words paired by a disjunctive "or." And when interpreting statutes, we normally presume that each word does independent work. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). This is sometimes called the "presumption against surplusage" canon of statutory interpretation.

But "like all other canons, this one must be applied with judgment and discretion, and with careful regard to context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012). After all, drafters may "repeat themselves." *Id.* at 177.

There can be good reason for repetition, depending on the context. This case presents one such context because the Act bridges two legal worlds by shifting controversies about sexual assault and harassment from arbitration into civil litigation.

In civil litigation, the coin of the realm is the "claim," and claims make up a plaintiff's "case." When a plaintiff has a claim against a defendant, he has a "case" and files suit. So, when regulating civil litigation, both Congress and state legislatures often speak of "claims." *See, e.g.*, 28 U.S.C. §§ 1367, 2679; Ohio Rev. Code Ann. § 2744.04(B). So do the Federal Rules of Civil Procedure. *See, e.g.*, Fed. R. Civ. P. 12(b)(6).

In the world of arbitration, the coin of the realm is the "dispute."  Indeed, Black's Law Dictionary defines "arbitration" as a "*dispute-resolution* process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute."  *Arbitration*, Black's Law Dictionary (12th ed. 2024) (emphasis added).  Likewise, American Heritage defines it as "[t]he process by which the parties to a *dispute* submit their differences to the judgment of an impartial person or group appointed by mutual consent or statutory provision."  *Arbitration*, American Heritage Dictionary (5th ed. 2022) (emphasis added).

Congress has long appreciated that arbitration is a process for resolving "disputes," just as civil litigation is a process for resolving "claims."  The U.S. Code is filled with provisions regarding how and which "disputes" get "arbitrated."  *See, e.g.*, 49 U.S.C. §§ 11708(b)(1), 14708; 25 U.S.C. § 416a(c); 17 U.S.C. § 1321(d).  State codes are no different. *See, e.g.*, 205 Ill. Comp. Stat. Ann. 715/15 ("Arbitration of disputes"); Ohio Rev. Code Ann. § 903.14 ("[T]he parties to the dispute shall submit the dispute to an arbitrator for nonbinding arbitration."); Cal. Health & Safety Code § 1373.20(a).  In fact, Memmer's employment agreement with UWM provided that if a "dispute" arose under the employment agreement, it would be submitted "to binding arbitration."  R. 7-1, Pg. ID 82.

At bottom, both claims and disputes are terms of art that define legal controversies.  In both instances, one party has allegedly violated the legal rights of another.  The underlying controversy arises at the same time, no matter the venue—an arbitrator's conference room or a judge's courtroom—in which the parties choose to settle their differences.  But we often call that controversy by a different name depending on the venue.  Claims get litigated in courtrooms. Disputes get arbitrated in conference rooms.

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act moves sexual harassment and sexual assault disputes out of the conference room and into the courtroom.  In bridging the gap between arbitration and civil litigation, the Act understandably speaks the language of both arbitration and civil litigation.  It talks of "sexual harassment dispute[s]" and "sexual assault dispute[s]."  9 U.S.C. §§ 401(3), (4).  That makes sense because the heart of the Act reaches back to those same disputes and explains that they are no longer

arbitrable.  If the employee-plaintiff decides to "file[]" a "case" in court about a sexual assault or sexual harassment controversy (that is, a sexual assault or sexual harassment "dispute"), then the relevant "predispute arbitration agreement" is no longer valid.  *Id.* § 402(a).  The courthouse doors, once tightly shut, are now wide open.  What would have been an arbitrable "dispute" is now a "claim" that can be litigated.

But which predispute arbitration agreements does the Act cover?  Which arbitrable disputes can now be litigated claims?  In offering an answer to these questions, Congress confronted something of a pickle.  In the statute thus far, Congress had mostly been speaking the specialized language of arbitration.  It was explaining which sorts of once-arbitrable disputes the Act covers.  Hence its use of "disputes."  But on the timing front, there's no established body of law governing when arbitrable disputes "arise."  As the majority itself recognizes, "we lack a set legal framework to determine when a dispute arises."  Maj. Op. at 9.  Indeed, the "dispute[s] aris[ing]" construction is unknown to the U.S. Code, save for this Act.

So, if Congress had pegged the Act's effective date to the date on which the dispute arose, courts would be forced to fashion novel rules dictating when arbitrable disputes "arise" to figure out which disputes the Act covers.  (Which is what the majority elects to do.)  But there is an established body of law governing when claims accrue.  And recall that there's no inherent difference between arbitrable "disputes" and actionable "claims"; the two are different only insofar as they are resolved in distinct forums.  So, Congress lumped the two together in the effective date provision, thereby giving us a clue about when a dispute arises:  the time at which it accrues as a claim.[1]

In sum, the statute's structure and its unique context (of bridging the worlds of arbitration and civil litigation) together show that for purposes of the Act's effective date provision, disputes arise when claims accrue.

---

[1]The majority contends that Congress "could have used the language of claim accrual alone" in the effective date provision if it had wanted to tie that provision to the claim accrual date.  Maj. Op. at 13.  Not necessarily.  Thus far, the Act had spoken in terms of sexual harassment and sexual assault *disputes*.  *See* 9 U.S.C. §§ 401(3), (4).  It would have been puzzling to abruptly omit "dispute" from the effective date provision.

### III.

Ignoring the statute's context and structure, the majority slices the effective date provision into discrete phrases—"a formula for disaster." *Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 982 (7th Cir. 1992) (Easterbrook, J.). Instead of pairing the time at which a dispute arises with the time at which a claim accrues, the majority reasons that "[d]epending on the facts, a dispute could arise when an injured party sends the defendant a demand letter, files an administrative charge, requests arbitration, commences a lawsuit, or some other event occurs"—which, of course, tends to be after the injured party's claim accrues. Maj. Op. at 9.

Even putting statutory context aside, the majority's interpretation still misses the mark. Pairing when disputes arise with when claims accrue best squares with the ordinary meaning of the text viewed in isolation. A "dispute" is a "conflict or controversy, *esp. one that has given rise to a particular lawsuit*." *Dispute*, Black's Law Dictionary (12th ed. 2024) (emphasis added). So, the conflict or controversy is separate and apart from the formal legal demand to which it may give rise. Disputes arise in the real world—something happens, and it generates conflict or disagreement. In response, someone may sue and ask a judge to resolve the preexisting dispute. The lawsuit doesn't create the dispute; the dispute creates the lawsuit. In all cases, the dispute predates the formal legal demand—whether that may be the filing of a lawsuit, an administrative charge, a demand letter, a request for arbitration, or "some other event." Maj. Op. at 9. Given the ordinary meaning of the term "dispute," the formal charge or suit to which it gives rise can't possibly mark its emergence. The dispute must pre-exist the lawsuit, just as a claim must.

### IV.

If any doubt remains, the legislative history confirms our reading of the Act's text in context and that context's bearing on the effective date provision's meaning.

Legislative history can never override the statute's text, but it can illuminate the "context" in which the statute was passed. *Matter of Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.). Context is critical: "no 'textualist' favors isolating statutory language from its surrounding context." Caleb Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347, 348

(2005).  "To strip a word from its context is to strip that word of its meaning."  *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring).  Thus, textualism requires examining the context "in which a statute was enacted because this may have an important bearing on what its words were understood to mean at the time of enactment."  *Bostock v. Clayton County*, 590 U.S. 644, 705 (2020) (Alito, J., dissenting).

Therefore, though always a fraught business, looking to a statute's legislative history can be useful to the extent that it clarifies the ever-critical context in which Congress enacted a statute.  Why?  Because the legislative history may reveal "the setting of the enactment and the assumptions its authors entertained about how their words would be understood.  It may show, too, that words with a denotation 'clear' to an outsider are terms of art, with an equally 'clear' but different meaning to an insider."  *Matter of Sinclair*, 870 F.2d at 1342.  That is, "legislative history" can help "establish[] linguistic usage"—namely, "that a particular word or phrase is capable of bearing a particular meaning."  Scalia & Garner, *supra*, at 388.

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act's legislative history makes clear that members of Congress understood "disputes" and "claims" to be the same thing—legal controversies.  This insight cuts against the majority's strained interpretation of these words to mean that there are different potential trigger dates for when the same legal controversy comes into being.

Consider the House Judiciary Committee report's description of Section 402—the heart of the Act.  Section 402 states:  "at the election of the person alleging conduct constituting a sexual harassment *dispute* or sexual assault *dispute*, . . . no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable."  9 U.S.C. § 402(a) (emphases added).  In describing this provision, the House Committee wrote that it "provides that at the election of a person alleging conduct that constitutes a sexual harassment or sexual assault *claim*, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable relating to *disputes* described within the chapter."  H. Rep. No. 117–234, at 19 (emphases added).  In other words, the House report swapped out "dispute" for "claim."  That change indicates the two are interchangeable.

The House report wasn't alone.  Representative Nadler stated that the bill gives survivors of sexual assault or harassment "a real choice of whether to go to court or to arbitrate their claim."  168 Cong. Rec. H985 (daily ed. Feb. 7, 2022).  Representative Nadler's characterization of the Act's focus on "claims," even when all of its operative provisions deal with sexual assault or sexual harassment "disputes," was echoed by a number of the Act's co-sponsors.  *See, e.g.*, *id.* at H987 (statement of Rep. Griffith), H987 (statement of Rep. Jayapal), H988 (statement of Rep. Jackson Lee), H989 (statement of Rep. Garcia).  And these same speakers would also use "claim" and "dispute" interchangeably within the course of a single speech.  Representative Nadler discussed survivors' "claims" in the same speech in which he referred to survivors' "disputes."  *Id.* at H984.  Other co-sponsors did the same.  *See, e.g.*, *id.* at H987 (Rep. Jayapal referring to both "disputes" and "claims").

The point of this legislative history is not to deduce "the contents of the authors' heads" but to understand "the rules of language they used."  *Matter of Sinclair*, 870 F.2d at 1342.  It reveals that the rules of language on Capitol Hill when Congress passed the Act included a presumption that "disputes" and "claims" are the same.  Indeed, the former just happens to be what we call the legal controversy when it's arbitrated as opposed to litigated.  So, it doesn't make much sense when interpreting the effective date provision to conclude that they are any different.

The majority, for its part, concludes that legislators used the words "claim" and "dispute" in the floor debates loosely.  Exactly.  As I've pointed out, legislators regularly used these words interchangeably.  Legislators didn't seem to conceive of much of a difference between claims and disputes.  Again, that loose language can be probative for the limited purpose of grasping "the rules of language" that the legislators "used."  *Id.*

In sum, the legislative history confirms what the rest of the statute's context and structure indicate:  that "disputes" and "claims" are one in the same, such that they "arise" or "accrue" at the same time.  "Since iteration is obviously afoot in the relevant passage, there is no justification for extruding an unnatural meaning" from the words, given the Act's context, "simply in order to avoid iteration."  *Moskal v. United States*, 498 U.S. 103, 120 (1990) (Scalia, J., dissenting).

V.

Understood in this way, Congress's repetition makes good sense and isn't a case of superfluity.  Though disputes arise and claims accrue at the same time, each of these words did work in the statute by helping bridge the gap between arbitration and civil litigation.

In fact, the majority's reading that gives independent meaning to "disputes" (and when they "arise") and "claims" (and when they "accrue") will often give rise to a superfluity concern of its own.  Such a reading begins by drawing on the ordinary meaning of the word "dispute," without paying attention to its specialized meaning in the arbitration context.  Recall that a "dispute" is a "conflict or controversy, esp. one that has given rise to a particular lawsuit." *Dispute*, Black's Law Dictionary (12th ed. 2024).  So, the majority reasons, the dispute arises once "the parties [become] adverse to one another"—perhaps through some formal notification such as the filing of a lawsuit.  Maj. Op. at 9.

If this were correct, then the date upon which a dispute arises would nearly always postdate the date upon which the employee's underlying claim allegedly accrues.  After all, employees notify their employers of the harms they claim to have suffered once they sustain that harm—that is, after their claim accrues.  So, except for instances where a violation continues, and thus a claim re-accrues, disputes would always arise after claims accrue.  And if that's the case, then the effective date provision's claim accrual language would often, in a practical sense, be pointless.

Memmer's own argument about the effective date provision's meaning falls into a version of this superfluity trap.  She argues that thanks to its language regarding when "dispute[s] . . . arise[]," the Act applies to all lawsuits filed after its enactment in March 2022. She filed suit in April 2023.

Memmer's argument fails for the reasons explained above—namely, that it's a mistake to distinguish between the date on which a dispute arises and the date on which a claim accrues when interpreting the effective date provision.

In addition, had Congress wanted to peg the effective date of the Act to filing dates, it could have. *See, e.g.*, Pub. L. 101-580, § 2(a), 104 Stat. 2863 (1990); Pub. L. 103-333, Title I, § 101(c), 108 Stat. 2548 (1994); Pub. L. 100-418, Title IX, § 9101(d)(1), 102 Stat. 1568 (1988). Congress knows how to countenance the "filing" of civil suits. *See, e.g.*, 28 U.S.C. §§ 2401, 2415(b). In fact, Congress used phraseology about when "case[s]" are "filed" in the Act itself. *See* 9 U.S.C. § 402(a). But that's not the language Congress used in the effective date provision. Its decision to omit such "filing" language in the effective date provision is quite telling. *See Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161–62 (2018). We should not ignore the choice Congress made.

VI.

Memmer quit her job on July 9, 2021. All her claims relate to discrimination and mistreatment that she experienced while an employee of UWM. So the latest that any of her claims could have accrued was July 2021—well before the Act took effect in March 2022. Therefore, the Act doesn't block her valid arbitration agreement with UWM.

*     *     *

Thus, I would affirm the district court. I respectfully dissent.